PETTUS *v.* STATE.

(In Banc.   Oct. 14, 1946.

[27 So. (2d) 536.   No. 36200.]

Jackson & Young, Joe H. Daniels and Milton Mitchell, all of Jackson, and P. P. Lindholm, of Lexington, for appellant.

**Greek L. Rice**, Attorney General, by **Geo. H. Ethridge**, Assistant Attorney General, for appellee.

Argued orally by **Forrest B. Jackson**, for appellant, and by **Geo. H. Ethridge**, for appellee.

**L. A. Smith, Sr., J.**, delivered the opinion of the court.

Appellant was indicted in the Circuit Court of Holmes County on a charge of knowingly receiving certain stolen automobile tires in violation of Section 2249, Code 1942. He was convicted, sentenced to a term of three years in the state penitentiary, and appealed here.

The assignment of errors, among other grounds, includes complaints that the court erred in overruling appellant's motions to exclude the State's evidence at its conclusion; to give him a peremptory instruction at the end of all the evidence; and to grant him a new trial because of such overruling of said motions. We think the court was correct in overruling all of these motions. The jury was justified in returning a verdict of guilty on the evidence,—at least, we cannot say it was against the great overwhelming weight of the evidence or manifestly wrong.

A man named Thurmond operated a store in Lexington dealing in tires, as well as being connected with and interested in several other business enterprises there. On the morning after the tires were stolen, on January 31, 1945, he was informed that his store had been burglarized. Upon taking an inventory he ascertained that sixteen Davis tires were missing. On them were serial numbers, the name of the tires, as well as the name and address of the merchant's business house, as consignee. He reported the theft to the sheriff and the local Rationing Board, to which board, of course, he had then to account for all tires leaving his place of busniess. Ultimately, all the tires were recovered, but from some of them the serial numbers had by that time been erased. Some were returned by the sheriff, and about ten days after the burglary, one J. R. Ables, Jr., returned to Mr. Thurmond eight tires, at the instance of appellant.

Before the eight tires were brought to Mr. Thurmond by Mr. Ables, Jr., and after appellant had been arrested and released from jail on bond, he went to the home of Mr. Thurmond and offered to ''see what he could do (about getting the tires back) and in an hour and a half they brought them back.'' Further, when appellant made this offer to Mr. Thurmond he was under the impression charges had been filed with the local OPA. Mr. Thurmond informed appellant that he ''was interested only in getting the tires back.'' This conversation was a circumstance from which appellant argues that the jury could have deemed him participating with operators of a black market in tires more justifiably than finding him guilty of receiving stolen tires, knowing them to have been stolen. He contends that the trial court erred in granting the State a certain instruction, which will be discussed, post, limited to reasonable doubt, and not including therein that the jury ''must in its consideration exclude every other reasonable hypothesis than that of guilt.'' The potency of this contention is impaired heavily by the fact that the consignee was a prominent

business man in Lexington, interested in several important commercial enterprises, and the name and address of his store were on each tire, as well as the shipping point and date of shipment, when stolen and brought to appellant's place of business.

The events culminating in the theft of these tires, so far as is material to our discussion, are that one Wall operated a filling station in Durant at the time, but did not deal in tires. A former convict named Perkins, from St. Louis, whence also had come Wall a few months earlier, came to Wall's filling station and said he wanted to buy an old car there, which was for sale. Wall pointed out that the tires on it were bad, but said it could be completely re-tired for about $85. Perkins told Wall not to worry about tires, and asked Wall to take a trip with him, which Wall agreed to do if there were enough in it for him. Wall picked up Perkins about six o'clock that evening, driving to Lexington in Wall's truck. They separated after reaching Lexington, but got together again with some whiskey. They went to the picture show, and while there Perkins obtained the keys of Wall's truck from him, and when the show was over, Wall went out to his truck, and, in his words, "I looked in the truck and the truck was loaded with tires in there." Mirabile dictu! He, however, evinced no curiosity about them. They then, at Perkins' suggestion, went to the place of John Pettus, the appellant here, on Highway No. 51. Upon arriving there they did not drive up to the front entrance, but went around to the side of the building, about eleven o'clock at night, and put the tires under the bed in a back bedroom occupied by a woman employee, Miss Falkner, although there was a storeroom for such property. She later testified for the State in corroboration of the testimony of Wall.

Appellant, according to the State's testimony, when asked by them if he wanted some tires, replied: "Hell, yes, I want those tires. Where are they?" According to appellant, he replied that he did not want them but

knew somebody in Yazoo County who did. Yet, in the course of subsequent driving around the countryside in appellant's Buick that night between eleven o'clock p. m. and three o'clock a. m., the State offered testimony as follows:

"Q. Where did you go then? A. The conversation came up about getting more tires.

"Q. What was that conversation? A. Bill (Perkins) said it wouldn't be no good to wait until another time and they said they were going back and get some more tires.

"Q. That conversation was between John Pettus and Bill Perkins? A. Yes, sir."

However, they did not go after more tires, as the witness said "They got froggy."

It must be borne in mind that appellant's acquaintance with Wall was not extensive, and he had never seen Perkins before that night.

Just before the start of this midnight tour appellant and Perkins loaded some of the tires in appellant's Buick car, and then appellant, Perkins, Wall, and a Miss Gwin Fowler drove to Coxburg, where four tires were left at the home of appellant's mother. Here some money passed and some was to be paid later. Then appellant and these three companions at that late hour of the night continued into Yazoo County, twelve or fourteen miles from appellant's place of business to the home of a Mrs. King, where they delivered four of the tires to her, she being the person, Wall said, who wanted some tires. These she later turned over to the sheriff. She did not have the price of the tires in cash and made out a check payable to appellant, over his protest, stating she did not know the others. This check he endorsed and turn over to Wall and Perkins, and later it served as a clue leading to the solution of the case. Other sales were also made on this trip.

Miss Falkner, under whose bed at appellant's place the tires were placed that night contrary to all previous pre-

cedent, stated that upon their return to appellant's establishment at three o'clock a. m., "He took the tires and left."

"Q. At three o'clock in the morning? A. Yes, sir.

"Q. Who is he? A. John Pettus and I helped him.

"Q. John Pettus and you put about half a dozen tires at three o'clock in the morning in John Pettus' car? A. Yes, sir.

"Q. Which way did he go? A. I don't know, I went back to bed."

Appellant's explanation about these particular tires, about which Miss Falkner was testifying, was that he first saw Perkins after that night, when he came by appellant's house one night later, in a two-door Chevrolet car. The sheriff was there hunting for him. Appellant said: "I did not recognize him," and neither did the sheriff. At another time during that same day Perkins told him where he had hid the tires. According to the appellant, "He said: 'Well, I am going up the line, if you need those tires, they are in the pine thicket and I will be seeing you.' I said: 'I don't need them but if I do, I will go get them.'"

Appellant further testified in his own behalf that he did not know where Perkins and Wall got the tires. In answer to a question from his attorney, he said there were black markets in Mississippi. That was all he said about it, simply that there were such markets in Mississippi. He further denied knowing that the tires were stolen, and receiving them. Appellant's brother, Charles, testified that he went to the pine thicket, which was in Madison County, on information given him by appellant, and there retrieved the tires. It will be remembered that Perkins was a transient and a stranger to that part of the country, and had already fled the scene.

Appellant insists we should reverse and remand the case because the trial court gave the State three erroneous instructions, which we will discuss in their order in the record.

. . State's instruction No. 2 is as follows: "The jury are instructed that guilty knowledge is not often capable of direct proof, that it is a conclusion to be drawn from all the facts and circumstances in the case, and if the jury are satisfied from the facts and circumstances that the defendant received or bought the goods and converted them to his own use when he had a knowledge, or had good reason to believe they were stolen property, then they will find guilty as charged."

Appellant says this instruction is fatally erroneous, because it failed to say that the jury must be "satisfied beyond a reasonable doubt," but authorized the jury to find appellant guilty if the jury were merely "satisfied from the facts and circumstances." He cites Drummond v. State, 103 Miss. 221, 60 So. 138, where a very similar instruction was given the State, and where we said "The giving of this instruction was clearly erroneous; but we think, from all the testimony in this case, including that of the defendant himself, no honest and reasonable jury could have rendered any other verdict than the one rendered in the case. The case is therefore affirmed." We think here the giving of this instruction was error, but not a reversible error.

"Satisfied" means a great many things. It is a word of considerable expansiveness, and not as definite and precise as "beyond a reasonable doubt." "Satisfied" means "to free from anxiety, doubt, perplexity, suspense, or uncertainty; to free the mind from doubt and uncertainty; to give assurance to; to relieve from all uncertainty or doubt; to set at rest the mind of, upon a given proposition. To satisfy one's self is to believe." 56 C. J. 130. It will be seen from such definition that the instruction could conceivably be considered metriculously correct, but it is a word of too general and diffusive significance, while our familiar phrase "beyond a reasonable doubt" has a specific and concise connotation and application. It is difficult of definition. Generally, definition is simply substitution of phraseology and there is no alternative,

efficient substitute for "beyond a reasonable doubt." Despite the futility of efforts correctly to define it, the mind perceives its meaning.

We agree that the instruction is erroneous, but not fatally erroneous here, especially in view of an instruction granted appellant which supplements the State's instruction by supplying the missing element, "beyond every reasonable doubt," in haec verba. This instruction given defendant is as follows: "The court charges the jury for the defendant that the burden of proof is upon the State to establish, to the satisfaction of the jury beyond every reasonable doubt, that the defendant is guilty as charged; and if the evidence fails in any respect to satisfy your minds and consciences, you must acquit the defendant by a verdict of Not Guilty." This assignment of error is, therefore, overruled.

The next error of which complaint is made involves the State's instruction No. 3, which is in the following language: "The Court instructs the jury that in considering the guilty knowledge of the defendant, they should consider the facts of their being stolen property, and the character of the goods received by him, whether they bore marks or brands indicating their ownership, and, if the property is shown to have been recently stolen, that they were of a nature which would indicate, or from which to a reasonable man would indicate, their being stolen, or if they bore marks and brands sufficient to bring to the defendant's mind the knowledge of their ownership, when received by him, then it is a presumption that the defendant had knowledge of their being stolen property."

The Attorney General strives to justify this instruction by urging it has often been granted the State in other cases, and also citing Crowell v. State, 195 Miss. 427, 15 So. (2d) 508. The appellant argues it is fatally erroneous because it makes the test whether or not a reasonable man would have known that the tires were stolen; and because it "sets out therein a presumption of guilty, which is a violation of the due process clauses of the

Constitutions of the United States and the State of Mississippi." In this connection, as to the reasonable-man feature, a rather awkward and inept way to express what the instruction probably intended, we have heretofore decided that the word "knowing" in its relation to receiving stolen goods means that, if a person has information from facts and circumstances which should convince him that property has been stolen, or which should lead a reasonable man to believe that property had been stolen, then in a legal sense he knew it. Francis v. State, 154 Miss. 176, 122 So. 372, 373. See also Sartorious v. State, 24 Miss. 602; and Frank v. State, 67 Miss. 125, 6 So. 842.

As to the "presumption" feature of the instruction, it is clearly and fatally erroneous. In the Crowell case, supra [195 Miss. 427, 15 So. (2d) 511], we said ". . . we conclude that it is never proper, in a case for receiving stolen goods knowing them to have been stolen, for the jury to be instructed, in effect, that the unexplained possession alone of such recently stolen property is either a circumstance from which guilt may be inferred or that such possession is a circumstance strongly indicative of guilt which will justify, support, or warrant a verdict for the state, where such possession is unaided by other proof tending to show that the accused received such property knowing it to have been stolen."

This part of the instruction is also a charge upon the weight of the evidence, and invades the province of the jury, and lures them from their duty to acquit the defendant unless they believe from the evidence beyond a reasonable doubt that he is guilty as charged. See also in this connection Sartorious v. State, supra. The instruction is also bad, because it is argumentative and improperly stresses particular items of the evidence, thus unfairly directing the attention to the jury to the matter so emphasized. Even though such evidence was competent, relevant, and important on the issue of guilt or innocence of accused, and could be argued against

the defendant by the district attorney, it was improper for the court to single it out, as was done here. The case will have to be reversed and remanded for the giving of this instruction.

Appellant also assigns as error the giving of the fourth instruction to the State as follows: "The court instructs the jury that it is not incumbent on the state to show by the evidence in order to convict the defendant, that the defendant acknowledge he received the goods, knowing they were stolen, or to prove that the parties from whom he received the same told him that they had previously stolen the goods charged; it is sufficient if all the facts and circumstances testified to in the case satisfy the minds of the jury, to the exclusion of every reasonable doubt, that the defendant knew or had good reason to believe the goods were stolen property, and if the jury believe this to a moral certainty arising out of the evidence, and beyond every reasonable doubt, they should convict the defendant."

The challenge to this instruction is that it authorizes a conviction based on circumstantial evidence, but fails to include therein the necessary element that the jury must exclude every other reasonable hypothesis than that of guilt. The burglary, as well as the identity of the tires involved, was proven by direct testimony, while the receiving of them by appellant, knowing they were stolen, and his fraudulent intent, were proven largely by circumstantial evidence. In his brief, appellant contends that the case is entirely circumstantial, and cites several cases, typical of which is Miller v. State, 99 Miss. 226, 54 So. 838, where the evidence was entirely circumstantial. It was not so here, nor is it unusual for criminal cases to contain some direct evidence and some circumstantial evidence. In such cases, as here, the above instruction is proper. It is only in cases, as a general rule, where the evidence is entirely circumstantial that the jury should be required to exclude every other reasonable hypothesis than guilt before a conviction can be had. Un-

aided, a jury could not analyze and classify the evidence, and the Court would find itself in difficulties if it attempted such an exacting undertaking for the purpose of aiding the jury to do so, and applying the differing rules to the evidence thus assorted, in a single instruction. We think the instruction under the conditions of this case was correct. The rule for which appellant contends here applies only to cases where the evidence is entirely circumstantial.

However, for the error in giving the State Instruction No. 3, supra, the case is reversed and remanded.

Reversed and remanded.

**Sydney Smith, C. J.,** did not participate in this decision.